EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ BARRETO PÉREZ, acusado y apelante.

*Números:* 17391 y 17392 *Resueltos:* 22 de junio de 1962

754

*Angel Viera Martínez,* abogado del apelante; *J. B. Fernández Badillo, Procurador General, y Rodolfo Cruz Contreras, Procurador General Auxiliar,* abogados de El Pueblo, apelado.

Sala integrada por el Juez Presidente Señor Negrón Fernández y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

█ El apelante fue acusado de asesinato en primer grado y convicto de segundo. Ataca la apreciación que hizo el jurado de la prueba. Alega que actuó en su propia defensa y que si no se le daba crédito a esa prueba, debió ser convicto de homicidio. Acabamos de resolver ratificando dictámenes anteriores que "[c]orresponde al jurado por ley la facultad de juzgar sobre la credibilidad de los testigos y no alteraremos sus conclusiones a menos que se demuestre que abusó de esas facultades al dar crédito a los testigos de cargo". *Pueblo* v. *Aletriz*, 85 D.P.R. 646 (1962).

1, 2.—Lo antes expresado dispone de los dos primeros errores. El acusado y la víctima eran vecinos y residían en la Calle Esteban Padilla de Bayamón. La prueba demuestra que el acusado fue a casa de la víctima y le manifestó que quería hablar con él. Aparentemente había ingerido bebidas embriagantes. Salieron en un vehículo perteneciente a la víctima y se dirigieron por la Carretera Núm. 2 a un sitio cerca del puente que cruza el Río Bayamón. Se estacionaron bajo unos bambúes a la orilla de la carretera. Cuando el occiso salió de su casa estaba con su cuñado Pedro Seda Collado, quien los siguió en otro vehículo y llegó al sitio donde ocurrieron los hechos. Seda declaró que cuando llegó al sitio el occiso le informó "que Barreto me pidió que nos montáramos en la guagua para hablar conmigo y me sale ahora con que en la guagua trae una pistola para herirme". El occiso estaba parado detrás de la guagua y el acusado al frente. El testigo fue a donde el acusado y éste tenía en las manos una pistola apuntando hacia el suelo. El testigo le pregunta qué es lo que le pasa con la víctima y contestó el acusado "que este hombre me ha cogido de pendejo". A eso el testigo le dice que cómo le va a tirar a un hombre que anda desarmado. No habla más con él. Al rato sale el occiso de detrás de la guagua y el

acusado le hace unos disparos. La víctima cae al suelo. El acusado entonces se dirige a la guagua en que fueron al sitio y saca una pieza de hierro y la coloca al lado del cuerpo de la víctima. Un automóvil que pasaba se detuvo y llevaron al occiso al Hospital de Distrito. El acusado se quedó en el sitio. ■

La prueba de defensa consistió en que el occiso lo había atacado con la pieza de hierro que antes mencionamos, y que para defenderse tuvo que disparar el arma. No recibió herida o contusión alguna. Alega que en caso de que no procediera la defensa propia, que el veredicto debió haber sido por homicidio. Pero el jurado no le dio crédito a esta versión. Creyó lo que Seda declaró. Y la prueba de cargo establece que fue el acusado quien invitó al occiso a salir del sitio donde estaba porque tenía que hablar con él. La prueba no establece el elemento de súbita pendencia y arrebato de cólera. ■

3.—El tercer error impugna el procedimiento utilizado para determinar si la declaración prestada por el acusado ante el fiscal fue voluntaria. El apelante sostiene que el procedimiento seguido le perjudica, pues los jurados siempre se enteran de que el juez ha hecho una determinación previa de que fue voluntaria. El juez en este caso siguió el procedimiento que sancionamos en *Pueblo* v. *Declet*, 65 D.P.R. 23 (1945); *Pueblo* v. *Fournier*, 77 D.P.R. 222 (1954) y que ratificamos recientemente en *Pueblo* v. *Andrades González*, 83 D.P.R. 849 (1961), donde dijimos que siempre en la primera etapa debía excluirse al jurado y que no había "necesidad de informarle cuando se le instruya que el juez ha hecho una determinación previa de que hay prueba al efecto de que la confesión es voluntaria". Y en este caso no aparece que se le informara al jurado que el juez había hecho una determinación previa al efecto de que la declaración era voluntaria.

4.—El cuarto error lo consideraremos cuando discutamos los otros errores apuntados y que se refieren a las instruc-

ciones dadas por el juez de instancia. Ahora consideraremos el quinto y sexto error. ■

5.—El quinto consiste en que el juez a quo, refiriéndose a un incidente entre el fiscal y el abogado defensor manifestó "Eso último no tendría importancia." El juez hizo el comentario cuando la defensa insistía con el taquígrafo que tomó la declaración que prestó el acusado ante el fiscal, que le informara si aparecía tachada en la libreta la frase "y le echó mano a la varilla". La defensa interpretó, y así se lo hizo saber a la corte, que para él eso tenía mucha importancia "porque lo que está envuelto es el hecho de las tachaduras". La corte enseguida explicó "Lo que está envuelto es el hecho del incidente que la corte ha dicho que quiere evitar, por considerar que es impropio frente a los derechos de las partes. Por eso me veo compelido a evitar que ocurran estos incidentes y que ocurran estos comentarios. Ese es el alcance de mis palabras". Vemos pues que la corte inmediatamente explicó el alcance del comentario y todo quedó aclarado ante el jurado. El juez en su comentario se refería al incidente entre el fiscal y la defensa. Y la verdad es que como veremos más adelante, aunque el juez se hubiera referido a la frase, tampoco tenía importancia porque el concepto que aparentemente se había tachado aparecía en la declaración jurada. ■

6.—Mediante el sexto error se impugna la resolución de la corte admitiendo en evidencia una declaración prestada por el acusado ante el fiscal y que fue tomada por un taquígrafo, quien la transcribió. El acusado no la firmó. El apelante sostiene que se cometió error al admitirla por los siguientes fundamentos:

(a) No firmó la declaración;

(b) No se le hicieron las advertencias legales pertinentes al acusado antes de que declarara;

(c) No tuvo asistencia de abogado;

(d) Estaba en estado de embriaguez cuando prestó la declaración.

Los fundamentos expuestos por el apelante para sostener su apuntamiento no son válidos. *Pueblo* v. *Green*, 75 D.P.R. 855 (1954) resuelve en su contra el expuesto bajo la letra (a). Los expuestos bajo las letras (b) y (c) fueron resueltos contrario a su contención en *Rivera Escuté* v. *Delgado*, 80 D.P.R. 830 (1958); *Pueblo* v. *Lebrón*, 61 D.P.R. 657 (1943) y *Pueblo* v. *Montes*, 64 D.P.R. 321 (1944).

En cuanto a que el apelante estaba en estado de embriaguez la prueba lo que revela es que lo estaba cuando ocurrieron los hechos pero no cuando prestó la declaración que se objeta. ■■

De una lectura de las instrucciones en su totalidad, surge que el juez le explicó adecuadamente al jurado cuál era su función. Les enfatizó y les hizo claro que era a ellos a quienes correspondía considerar en todos sus aspectos la declaración. A ese efecto les dijo: "Si determinan, conforme a mis instrucciones—que les voy a ampliar ese concepto—que es voluntaria, la consideran; si determinan que es involuntaria, no la consideran". La explicación que el juez le dio al jurado de lo que era una confesión y lo que constituía una admisión, es fundamentalmente correcta. Es similar a la que se expuso por la Corte de Apelaciones para el Distrito de Columbia en *Jones* v. *United States*, 296 F.2d 398 (1962) cuando expresó:

"Las confesiones son admisiones del crimen en sí. Las llamadas admisiones se refieren a algún hecho específico que tiende a establecer la culpabilidad o algún elemento del delito." ■

7, 8.—Los errores séptimo y octavo impugnan "[l]as instrucciones dadas por el tribunal sentenciador al jurado sobre malicia, premeditación, deliberación y asesinato". Sostiene el apelante que esas instrucciones son erróneas. Y que fue erróneo instruir al jurado al efecto de que:

"a.—'El usar intencionalmente un arma peligrosa y matar a una persona, la inferencia a deducir prima facie es que el acusado es culpable del delito de asesinato.'

"b.—'. . . y el hecho de apuntar y disparar un arma de fuego contra una persona y matarla, es bastante para que exi[s]ta la premeditación y deliberación, sin que obste a ello la rapidez con que el acto se haya realizado.' "

El apelante incurre en la práctica que tanto hemos censurado de entresacar unas oraciones de entre la totalidad de las instrucciones para sostener su punto. Las instrucciones hay que aquilatarlas en conjunto. Así, copiaremos las que sobre esta materia transmitió el juez de instancia:

"La malicia de por sí es premeditada. La premeditación puede formarse en un instante antes del acto, y puede existir premeditación no obstante la rapidez con que el acto se haya realizado.

"La malicia expresa existe cuando una persona serena y fríamente y con propósito deliberado, da muerte ilegal a otra. Tal propósito se demuestra por circunstancias exteriores capaces de revelar y descubrir la formada intención del delito. Y malicia tácita es la que la ley deduce del hecho delictivo, considerado en sí mismo, y así, cuando la muerte de una persona resulta evidente y no hay ninguna circunstancia en la prueba que tenga por objeto mitigar, excusar o justificar el acto ejecutado por el que se acusa, entonces se presume la existencia de la malicia tácita.

"Cuando las circunstancias indican la muerte de un ser humano por otro, se presume la malicia.

"Como les digo, la malicia, de por sí es inherente premeditada. Y premeditación puede formarse en un instante antes del acto. Y puede existir premeditación no obstante la rapidez con que el acto se haya realizado.

"La intención se puede manifestar a través de uno de los dos siguientes elementos, cualquiera de los cuales es suficiente para determinar la existencia de la intención de ocasionar la muerte de un semejante. Esa intención se puede manifestar a través de uno de los dos siguientes elementos:

"1.—La intención específica de matar considerada como equivalente al deseo y propósito directo expresado y confir-

mado de matar; o sea, presume simultaneidad en el propósito directo de matar, o

"2.—La intención de realizar un acto o de producir grave daño corporal, cuya consecuencia probable sea la muerte de una persona.

"Debo indicarles aquí que no obstante la presunción de malicia aludida, o sea, la que les he indicado, la existencia de malicia es una cuestión de hecho a ser resuelta exclusivamente por el jurado, a considerar de la propia prueba presentada por el Ministerio Público; o si de la totalidad de la prueba surgen circunstancias de mitigación, excusa o justificación, o si surge de la prueba ausencia de intención criminal, debe descartarse la presunción y en todo caso el jurado, ustedes tienen derecho a llegar a sus propias conclusiones sobre la existencia o ausencia de malicia. Y si hay duda razonable conforme a lo que les he dicho, consideren esta duda sobre la existencia de malicia. Si tienen duda razonable sobre la existencia de malicia, deben descartar que la malicia existió."

Y sobre los otros extremos que impugna el juez manifestó:

"La ley divide el delito de asesinato en dos grados: asesinato en primer grado y asesinato en segundo. Todo asesinato perpetrado por medio de veneno, acecho o tortura, y toda clase de muerte voluntaria, deliberada y premeditada, o cometida al perpetrarse o intentarse algún incendio de morada, violación, robo, escalamiento o mutilación, constituye el delito de asesinato en primer grado. Y es asesinato en segundo grado la muerte ilegal de un ser humano con malicia premeditada, pero sin que medie deliberación; siendo bastante con que la muerte se verifique sin resultar notable provocación, o que las circunstancias concurrentes demuestren un corazón pervertido y maligno.

"El usar intencionalmente un arma peligrosa y matar a una persona, la inferencia a deducir prima facie es que el acusado es culpable del delito de asesinato.

"En el asesinato en primer grado la evidencia debe demostrar que ha habido la intención específica deliberada de quitar la vida. Y la ausencia de la intención específica deliberada de matar, reduce el delito de asesinato en primer grado a asesinato en segundo grado.

"El término voluntariamente empleado en nuestras leyes implica el propósito de realizar el acto, por tanto la muerte se

considera voluntariamente causada cuando existe una intención específica de quitar la vida. No es necesario que transcurra espacio alguno de tiempo entre la muerte y el propósito o designio de matar; solamente es necesario que el acto de matar sea precedido por la ocurrencia de la voluntaria deliberación y premeditación del agente del delito, sin tener en cuenta la rapidez con que pudieran sucederse entre sí los actos del pensamiento, ni la rapidez con que pueda suceder el acto de matar.

"El término 'premeditación' significa que el acto fue preconcebido y realizado después de reflexionado.

"El término 'deliberación' significa un estado de serenidad o sangre fría; no significa calcular o reflexionar durante mucho tiempo, sino una intención o propósito de matar ejecutado por el acusado en un estado de serenidad, como consecuencia del deliberado propósito de satisfacer una pasión o venganza, o para ejecutar cualquier otro acto ilegal. Es suficiente que el designio de matar existiese cuando se produjo la herida mortal.

"La 'premeditación' y 'deliberación' dependen de las circunstancias del caso, y el hecho de apuntar y disparar un arma de fuego contra una persona y matarla, es bastante para que exista la premeditación y deliberación, sin que obste a ello la rapidez con que el acto se haya realizado.

"La 'deliberación', como estado mental subjetivo que es, puede ser inferida del acto de disparar un arma; pero el disparo en sí no es conclusivo, depende de la existencia de deliberación. La presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por ustedes señores jurados.

"Debo decirles, por vías de mayor abundamiento, que deliberación es un estado de mayor serenidad en que el autor considera y selecciona distintas acciones y razones en cuanto a la comisión del acto y sus consecuencias.

"En los casos de asesinato, como en otras causas criminales, el *corpus delicti* debe probarse como una condición esencial de culpabilidad. El hecho de la muerte y la causa que la produjo son los únicos elementos que constituyen el *corpus delicti*. Y para que una persona pueda ser declarada culpable de asesinato, deben probarse esos elementos del *corpus delicti* y después que el acusado fue la persona que lo cometió.

"Es decir, los delitos se componen de elementos. *El corpus delicti* en asesinato es la existencia de una persona muerta, de la víctima; y después, segundo elemento, que esa víctima lo es, no del acaso, no de la voluntad de Dios, de la naturaleza, sino

que es víctima de un acto criminal. Ese acto y esa mano criminal y esos dos elementos constituyen el *corpus delicti*. Esos dos elementos tienen que estar conectados con el *corpus delicti*. Eso es lo que significa lo que les he dicho."

Las instrucciones sobre malicia, premeditación, deliberación y asesinato cumplen con nuestras decisiones. *Pueblo* v. *Méndez*, 74 D.P.R. 913 (1953) y *Pueblo* v. *Túa*, 84 D.P.R. 39 (1961). ■

Refiriéndonos a la instrucción al efecto de que "El usar intencionalmente un arma peligrosa y matar a una persona, la inferencia a deducir *prima facie* es que el acusado es culpable del delito de asesinato", en *Pueblo* v. *Méndez*, supra, manifestamos que era esencialmente correcta. ■

Consideraremos ahora la otra instrucción que el apelante entresaca para impugnarla. Es aquella en que el juez expresa ". . . y el hecho de apuntar y disparar un arma de fuego contra una persona y matarla, es bastante para que exista la premeditación y deliberación, sin que obste a ella la rapidez con que el acto se haya realizado". En *Pueblo* v. *Méndez*, supra, dijimos al comentar sobre una instrucción igual:

"Ahora bien, la malicia puede inferirse del uso de un arma, ya que tal uso puede implicar razonablemente una intención de matar o de causar daños cuya consecuencia probable sea la muerte. Sin embargo, la deliberación es un estado mental especial, una categoría específica dentro del campo general de la intención criminal, con contornos definidos, y equivale, como hemos visto, a un estado de relativa serenidad en que el actor considera y selecciona distintos factores y razones en cuanto a la naturaleza del acto y sus consecuencias. El acto de disparar con un arma puede ser deliberado, pero también puede ser impulsivo o impetuoso. Por esa razón es incorrecto el decir, en forma absoluta y sin calificación de clase alguna, que el disparar un arma es bastante para demostrar que ha habido deliberación, si a ello se le quiere dar el significado de que la deliberación es sinónimo automático y absoluto del acto en sí de disparar un arma, y si se quiere decir que la deliberación es parte integrante del hecho de disparar tal arma. La deli-

beración, como estado mental subjetivo que no es susceptible de prueba directa, puede ser inferida por el jurado del acto de disparar un arma. *Pueblo* v. *Rosario*, supra. En cuanto a esos extremos, están en lo correcto los casos arriba citados. Pero debe aclarársele al jurado que el acto de disparar un arma no es conclusivo definitivamente en cuanto a la presencia de deliberación, y debe indicarse en las instrucciones que la presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por el jurado."

Y eso fue precisamente lo que el juez le dijo al jurado en este caso, pues se expresó así:

"La deliberación 'como estado mental subjetivo que es, puede ser inferida del acto de disparar un arma; pero el disparo en sí no es conclusivo, depende de la existencia de deliberación. La presencia o ausencia de deliberación es una cuestión de hecho a ser resuelta por ustedes señores del jurado."

9.—Sostiene el acusado que "[e]l tribunal sentenciador invadió el área del jurado al decirle que aunque 'todos los testigos declararon que no vieron al acusado tomar licor y que no les daba tufo, ese hecho no niega que el acusado hubiera tomado licor.'" Pero es que el juez también le instruyó en el sentido de que "[s]i había tomado o no había tomado licor, eso lo van ustedes a resolver en su deliberación". Con esto basta para disponer de este error. ■■■

10.—Objeta el apelante el análisis que el tribunal sentenciador hizo de la prueba. En *Pueblo* v. *Cruz*, 78 D.P.R. 80, 83 (1955), dijimos:

"Basta con que las instrucciones de la corte contengan un resumen de la evidencia razonablemente completo, [citas] siendo suficiente que el juez exprese lo que sustancialmente se ha dicho [citas]. Si el juez deja al jurado, como lo hizo en este caso, la determinación de las cuestiones de hecho, es suficiente que le ofrezca meramente un resumen general de la evidencia de una y otra parte."

Eso precisamente fue lo que hizo el juez en este caso. ■■■

11.—El apelante vuelve a entresacar de las instrucciones lo siguiente: "el Ministerio Público no viene obligado a probar la voluntariedad de las admisiones". El juez al

ïnstruir al jurado se expresó así: "Ahora, tanto confesiones ,como admisiones, para que ustedes puedan tomarlas en con- ;sideración tienen que ser voluntarias. Si no son voluntarias ;ustedes no pueden considerar ni las unas ni las otras. . ." "'Si una admisión o si una confesión es voluntaria o no es 'materia para determinarse por los señores del jurado". Y :además, el fiscal de hecho presentó prueba en cuanto al carác- ter voluntario de la declaración prestada por el acusado y la defensa no presentó prueba en contrario. Cf. *Pueblo* v. *Rodríguez*, 65 D.P.R. 530, 532 (1946). ■

Pasemos a considerar el otro error, el décimoquinto que trata también sobre las instrucciones. Sostiene el apelante que las instrucciones sobre homicidio voluntario y sobre defensa propia son erróneas. ([1])

---

([1]) Sobre homicidio instruyó así el Juez:

"Homicidio es dar muerte ilegal a un ser humano sin que medie malicia. Vieron ustedes cuando les expliqué el delito de asesinato, que uno de sus ingredientes era la malicia. Premeditación y deliberación es primero, pero la malicia no es un elemento del homicidio; y el homicidio difiere del asesinato, pues no requiere de malicia. Es el homicidio de dos clases: Voluntario, cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera. Involuntario, cuando ocurre al realizarse un acto ilegal que no constituyere delito grave, o al realizarse un acto' legal que pudiera ocasionar la muerte en forma ilegal o sin la debida prudencia o circunspección.

"Para que la muerte constituya homicidio, es preciso que la víctima muera dentro de un año y un día de recibir la herida o de administrarse la causa de la muerte.

"Ninguna persona podrá ser convicta ·de homicidio, a menos que la muerte de la persona que se alegare haber sido muerta, y el hecho de la muerte que se alegare haber sido causada por el acusado, resultaren probados como actos independientes; aquélla, o sea la muerte, por medio de pruebas directas, y éste, o sea el hecho de la muerte, de modo que no haya lugar a duda razonable."

. . . . . . . . .

"El homicidio es, pues, un acto voluntario e intencional propiamente del :autor, en que no medie malicia ni premeditación. En ese caso, se trata de un arrebato de cólera o súbita pendencia. La provocación debe ser suficiente para excitar una pasión irresistible en una persona razonable ·que ordinariamente tenga dominio sobre sí mismo. Y es solamente con- .siderando la fragilidad humana que la ley reduce el asesinato a homicidio. *En cuanto a su elemento de súbita pendencia en mutuo combate, cuando la muerte se ocasiona en un combate mutuo por súbita pendencia, para ·que pueda calificarse como homicidio, debe aparecer que no se tomó nin- .guna indebida ventaja por parte del acusado.* El uso de un arma supe-

De la instrucción transcrita al margen, el apelante entresaca lo subrayado y lo objeta como erróneo. Pero no tiene razón. Consideremos en primer lugar la instrucción sobre el mutuo combate. Lo único que se expresa es que para que la muerte de una persona, ocasionada a consecuencia de una pelea, se considere homicidio, el agresor no debe tomar ventaja indebida pues si ese es el caso se presume que medió malicia. Véase *People* v. *Sánchez*, 24 Cal. 17 (1864). El apelante omitió la siguiente expresión que a renglón seguido hizo el juez "El uso de un arma superior por parte del matador no es por sí solo suficiente evidencia de la cual pueda deducirse la existencia de malicia". Recuérdese que la defensa del causado consistió en que el occiso lo atacó con una "varilla" y que por eso él tuvo que hacer uso del arma de fuego. El juez en la instrucción que impugna expone la ley sobre la materia que hay que considerarla con la oración que el apelante omite. O sea el juez le dice al jurado si ustedes creen que realmente hubo una pelea entre el occiso y el acusado el hecho de que éste último usara un arma de fuego, mientras que la víctima lo que tenía era una varilla, ese hecho sólo no justifica inferir malicia por parte del matador. 

13.—Pasamos a considerar la instrucción sobre defensa propia que impugna el apelante. Vuelve a incurrir el acusado en la práctica de impugnar una sola expresión. Aquella que dice así: "Cuando no existe provocación considerable de parte del agredido, se supone malicia en el agresor. Por muy graves que parezcan las palabras injuriosas, no son por sí solas provocación suficiente, puesto que un hombre razonable debe ejercer paciencia y serenidad ante el insulto y el abuso". Además de que esta exposición de la ley es co-

---

rior por parte del matador no es por sí solo suficiente evidencia de la cual pueda deducirse la existencia de malicia. *Cuando no existe provocación considerable de parte del agredido, se supone malicia en el agresor. Por muy graves que parezcan las palabras injuriosas, no son por sí solo provocación suficiente, puesto que un hombre razonable debe ejercer paciencia y serenidad ante el insulto y el abuso.*" (Enfasis suplido).

rrecta porque en una sociedad civilizada no se debe recurrir a la violencia y privar de la vida a un ser humano, por meras provocaciones de palabras por muy injuriosas que éstas sean, a menos que exista un peligro inminente de grave daño corporal, lo cierto es que el juez le instruyó así:

"El peligro que justifica a un acusado a cometer el acto que se le imputa, puede ser real o aparente, pero debe haber algún acto que induzca a un hombre de ordinaria prudencia a creer que su vida estaba en peligro o que podía sufrir grave daño corporal. Y el jurado no tiene que considerar si el acusado estaba en verdadero peligro de su vida o de sufrir grave daño, sino solamente si las circunstancias eran tales que indujeran a una persona de mente sana a creer que su persona estaba expuesta a tal peligro y si racionalmente podía así creerlo y tenía suficiente causa para estimarlo así. Y si cometió el hecho bajo tal creencia y tenía suficiente causa para estimarlo así, aún cuando el peligro fuera aparente, esto es, aún cuando apareciera que el agredido no estaba armado, ustedes deben absolverlo."

14.—El error décimocuarto es frívolo. El juez al instruir al jurado leyó ciertas disposiciones de ley. El apelante alega que el taquígrafo no tomó notas taquigráficas de las disposiciones leídas. Ni siquiera se imputa que el juez hizo una lectura errónea de la ley.

15.—El acusado alega que las instrucciones sobre el delito de portar armas le perjudicaron. No es así. El acusado desempeñaba un cargo en el Fondo del Seguro del Estado y aparentemente en algún tiempo estuvo autorizado a portar un arma. Ahora la nueva Ley de Armas de 1951 exige un permiso que el acusado no tenía. Y el juez teniendo esto presente dio unas instrucciones erróneas que beneficiaron al acusado. Los instruyó al efecto de si el jurado creía que el acusado de buena fe creía que el permiso que él tenía antes de la nueva ley era válido, entonces no tenía la intención de violar la ley. Y a pesar de esta instrucción el jurado lo condenó.

Se confirmará la sentencia apelada que dictó el Tribunal Superior, Sala de Bayamón, con fecha 30 de marzo de 1959.