EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* JOSÉ MANUEL PRADOS GARCÍA, acusado y apelante.

*Número:* CR-69-99    *Resuelto:* 5 de noviembre de 1970

*Ángel Viera Martínez,* abogado del apelante; *Gilberto Gierbolini, Procurador General,* y *J. F. Rodríguez Rivera, Subprocurador General,* abogados del Pueblo.

PER CURIAM: El apelante fue acusado de asesinar a su esposa Evangélica Jiménez Rivera. Se radicaron acusaciones de asesinato en primer grado, ataque para cometer asesinato e infracciones de los artículos ocho y seis de la Ley de Armas. Fue convicto de asesinato en primer grado, acometimiento grave y de portación y posesión de armas, siendo sentenciado a reclusión perpetua, dos meses de cárcel, de 1 a 4 años de presidio y un año de cárcel, respectivamente. En 19 de febrero de 1968 radicó Moción de Nuevo Juicio, la cual fue

declarada sin lugar. Apeló de todas las sentencias, así como de la resolución denegando nuevo juicio.

Los hechos ocurrieron en 2 de diciembre de 1964, alrededor de las 7:30 de la noche. La prueba desfilada durante el juicio fue abundantísima. El primer testigo de cargo fue el Sr. Ángel Luis Flores Arzuaga quien testificó que era compadre y concuñado del apelante (casado con una hermana de la víctima, hija del Sr. Armando Jiménez). La noche de los hechos estuvo en casa de Armando Jiménez hasta alrededor de las siete de la noche yéndose luego para su casa en la Urbanización El Comandante, en donde a lòs pocos minutos de llegar recibió una llamada telefónica y con motivo de ella se dirigió con su esposa e hijos al lugar de los hechos, a casa del Sr. Armando Jiménez. Vio en una de las esquinas del primer cuarto de la casa un charco de sangre. De allí se dirigió al hospital de Carolina donde vio a Evangélica Jiménez en un automóvil frente al hospital. Le tomó el pulso "a ver si estaba viva y estaba muerta." (T.E. Vol. I, pág. 91.) Días antes había ido a visitar con el apelante a una espiritista en Bayamón y mientras se dirigían al lugar aquél le había manifestado "que él quería vender el equipo de su negocio y si no lo vendía iba a matar a su esposa y a sus hijos y se iba a pegar un tiro él", de lo cual el testigo trató de disuadirlo. (Ver T.E. Vol. I, pág. 94.) Le informó a Evangélica Jiménez las manifestaciones del acusado. En 28 de noviembre de 1964 en visita que el acusado le hiciera al testigo en su negocio, aquél le manifestó que necesitaba un revólver, a lo que le contestó el testigo que él no podía conseguírselo. Relató además que para el 1963 el acusado había perdido un revólver en un garage de gasolina. (T.E. Vol. I, págs. 113–116.)

El segundo testigo de cargo fue José Luis Rivero Cervera quien declaró ser pariente de la occisa y quien identificó el cadáver en Medicina Legal. (T.E. Vol. II, pág. 301.)

El tercer testigo de cargo lo fue el señor Oscar Landrau quien declaró que era dueño para el día de los hechos de la Farmacia La Providencia, localizada en la calle de Diego de Carolina. Que tenía un revólver Smith and Wesson calibre 45, teniendo licencia para portar armas. Que guardaba el revólver en un ropero situado en la parte trasera de la farmacia y que el acusado conocía este hecho. Que el día de los hechos el apelante fue a su negocio poco antes de las siete de la noche y entró a hacer una llamada por teléfono pero éste estaba dañado. Que salió afuera de la farmacia a hacer la llamada y al rato regresó. Que le obsequió un trago de un negocio-barra contiguo a la farmacia y que se comunicaba con la farmacia por la parte trasera en donde estaba situado el ropero. Que se tomó el trago y siguió observando el programa televisado de la Taberna India y que el acusado se fue de la farmacia al concluir dicho programa alrededor de las 7:30 P.M. Como a eso de las 8:00 P.M. notó que le faltaba el revólver. Que éste estaba cargado con cuatro balas blindadas y dos de plomo. Declaró además que el acusado gozaba de su confianza y que podía entrar al interior de su negocio. (T.E. Vol. II, págs. 329–338.)

El cuarto testigo de cargo fue Manuel Santos Aragón dueño de la barra en la calle Muñoz Rivera de Carolina. Que el día de los hechos el acusado entró a su negocio entre 7:30 y 8:00 de la noche. Que le manifestó: "Vengo para que me entregues, que maté a mi esposa". (T.E. Vol. II, pág. 395.) Que puso el revólver encima del mostrador. Que él se puso nervioso y se salió del negocio y que otra de las personas allí lo cogió y lo llevó al cuartel. Que no le notó al acusado ninguna mancha de sangre en la camisa ni en el pantalón. Que cerró el negocio y se fue a su casa. Que él era amigo tanto de la familia del acusado como de la occisa.

El quinto testigo de cargo lo fue Juan Medina Morales pensionado de la Policía de Puerto Rico. Para la fecha de los hechos era Sargento de la Policía y prestaba servicios

en Carolina. Declaró que la noche de los hechos cubría el turno de 8:00 de la noche hasta las 4:00 de la madrugada en el cuartel y que el acusado se presentó allí y le entregó un revólver en la mano. Que al hacerle entrega del revólver le manifestó "con este revólver acabo de dispararle a mi esposa." (T.E. Vol. II, pág. 420.) Que le informó además que el revólver era del Sr. Landrau. Que lo arrestó.

El sexto testigo fue el Sr. Armando Jiménez Rivero, padre de la occisa. Declaró que él era comerciante y que tenía un negocio de piezas de automóviles situado en la entrada de Rolling Hills en la carretera vieja de Carolina, al lado de su residencia. Que para la fecha de los hechos su hija Evangélica vivía en su casa con sus hijos desde hacía dos semanas, encontrándose separada de su marido. Que la noche de los hechos había llevado al hijo mayor del acusado a comprar helados a El Caporal en la carretera 65 de Infantería. Que al regresar le entregó el nene a su esposa por la puerta de atrás de su casa y se fue al negocio a preparar unas notas de pedido de piezas. Eran alrededor de las 7:15 de la noche. Que al rato de estar en su negocio sintió unos gritos que decían "Papi, papi me mata", (T.E. Vol. II pág. 474) y oyó unos disparos. Al oírlos corrió a su casa y entró por la puerta de atrás que estaba abierta encontrando a su esposa en el comedor con las manos en la cabeza. Al verlo su esposa le dijo: "Ay, Mandín, la mató, Mandín, la mató." (T.E. Vol. II, pág. 476.) Que en esos mismos momentos el acusado estaba tratando de abrir la puerta del frente de la casa y que de pronto le hizo un disparo. Que no sabe cuántos tiros oyó, sólo que fueron corridos. Que corrió a la cocina y tomó un revólver propiedad de su hermano Harry Jiménez, que había encima de un gabinete (de cinco a seis pies de alto) y corrió al comedor protegiéndose siempre con la pared y le disparó dos o tres veces al acusado, mientras éste trataba de abrir la puerta. (T.E. Vol. II, pág. 487.) En ese momento el acusado logró abrir la puerta y salió

yendo él entonces al cuarto donde estaba su hija en un charco de sangre. Que entonces salió corriendo del cuarto y salió afuera de la casa por la parte de atrás y ya el acusado se montaba en su guagua y salía hacia la carretera en dirección a Carolina. El testigo se le fue detrás pero se le perdió de vista, regresando de nuevo a su casa en los momentos en que sacaban a su hija para el hospital. Que la llevaron al hospital de Carolina.

El séptimo testigo de cargo lo fue el agente especial de la Detective Teodoro Marcucci Cruz. Declaró en relación con lo por él observado durante la investigación del sitio de los hechos. Que había en el cuarto una cama, un gavetero, un charco y manchas de sangre y plomos de bala. (T.E. Vol. III, pág. 926.) Que la habitación tenía una puerta. Que de los plomos había dos en el piso (uno en el charco de sangre y otro cerca), había un plomo incrustado en el gavetero (en la gaveta de arriba) y uno en la sala. (T.E. Vol. III, pág. 940.)

El octavo testigo de cargo lo fue el Dr. Néstor Loinaz quien fue el patólogo forense que practicó la autopsia en el cadáver de la víctima. Declaró que la muerte se debió a las heridas causadas por múltiples heridas de bala en el cuello y tórax que fracturaron la columna vertebral y laceraron el cordón espinal y la arteria subclavia. Testificó además que la occisa había recibido seis heridas de bala. (T.E. Vol. IV, págs. 120–134.)

El noveno testigo de cargo lo fue la Sra. Tomasa Rivera de Jiménez, madre de la víctima. Declaró que para la fecha de los hechos su hija hacía dos semanas que vivía con ellos. Que dos semanas antes de los hechos había ido a casa de su hija, encontrándola con golpes en un ojo, la boca hinchada, con golpes en una mano y en el brazo. Decidió traerse a su hija con los niños. (T.E. Vol. IV, págs. 292–294.) Que la noche de los hechos su esposo había ido con el hijo mayor del acusado a comprarle un mantecado y que al regresar a

eso de las 7:30 éste le entregó el niño en la puerta, yéndose al negocio sin entrar en la casa. Que su hija había hablado por teléfono con el acusado esa noche a eso de las 7:15 por alrededor de quince minutos. Que a eso de las 7:30 llegó a su casa el acusado y que su hija lo vio por la ventana del cuarto y se lo comunicó, ordenándole que le pusiera el seguro a la puerta. Que la puerta trasera por donde había entrado el niño estaba entreabierta. Que el acusado entró y tocó a la puerta del cuarto y que ella se puso nerviosa y le abrió. Que éste no traía nada en la mano y que ella trató de empujarlo con las dos manos. (T.E. Vol. IV, págs. 314–316.) Que el acusado le empujó y cayó recostada sobre la pared y que el acusado inmediatamente sacó el revólver de la cintura y apuntó hacia arriba. Que su hija que estaba sentada en el borde de la cama se levantó y empezó a gritar "papi, papi, me mata" poniéndose las manos en alto y ahí mismo el acusado comenzó a disparar. (T.E. Vol. IV, págs. 316–317.) Después de los disparos el acusado salió para afuera en dirección a la puerta de salida de la sala hacia el balcón. Que en eso entró su esposo corriendo y ahí el acusado le disparó y su esposo le disparó a él. Que su esposo no traía un arma en la mano. Que el acusado logró abrir la puerta y huír y que ella salió para el frente de la casa gritando "Magín, Magín, la mató, corre que mató a Babeling." (T.E. Vol. IV, pág. 326.) Uno de los primeros en llegar fue Luis Magín Velázquez. Declaró a preguntas de la defensa que no sabía si se le desprendieron botones a la camisa del acusado cuando ella le empujó. Aseguró además que su esposo antes de los hechos no portaba revólver ni había visto un revólver en su casa en ninguna fecha anterior a los hechos. Declaró además que antes de los disparos se mantuvo callada y nerviosa y que no llamó a nadie.

El décimo testigo de cargo lo fue el Sr. Luis Magín Velázquez quien declaró ser vecino de los padres de la víctima, habiendo sido el padrino de bodas del apelante y la

occisa. La noche de los hechos estaba en su casa y al oír unos disparos provenientes de la casa de Armando Jiménez le dijo a su esposa que llamara a la policía y se dirigió hacia allá. Que vio salir corriendo al acusado y cuando éste se montó en su guagua y salió en dirección a Carolina. Que la madre de la occisa lo llamaba pidiéndole ayuda. Que oyó primero unos disparos corridos, alrededor de cuatro y como un minuto o minuto y medio después escuchó dos o tres disparos más. Que subió a la casa y en el primer cuarto encontró a Evangélica entre un gavetero y la pared. La levantó y le notó una herida y procedió a acostarla en la cama. (T.E. Vol. IV, págs. 421–501.)

El undécimo y último testigo de cargo lo fue el Sr. Esteban Santiago Echevarría quien declaró sobre los seis casquillos de bala (Exh. IX) admitidos en evidencia y quien los marcó con unas rayitas dentro de esos casquillos. (T.E. Vol. IV, pág. 502.)

La prueba de defensa, como señala el Procurador General en su alegato, giró en torno a "aspectos y circunstancias lejanas a los hechos, fundamentalmente de carácter pericial."

El primer testigo de la defensa lo fue el Sr. Braulio Muñoz, armero de la Policía. Fue traído a testificar sobre la licencia para tener y poseer un arma correspondiente al Sr. Harry Jiménez Rivero (hermano del padre de la víctima). Con su revólver fue que disparó al acusado el padre de la víctima.

El segundo testigo de defensa lo fué el Sr. Jorge Luis Reyes, policía estatal. Declaró que en su presencia el Sr. Armando Jiménez le entregó al Policía José I. Santini un revólver.

El tercer testigo lo fue el Sr. Camilo Arcelay, experto en balística. Estuvo trabajando con la Policía por espacio de trece años. Su testimonio giró principalmente sobre proyectiles disparados la noche de los hechos y con los efectos

y características de éstos en el cuerpo de la occisa. Declaró a preguntas de la defensa que de acuerdo con los orificios de entrada descritos por el patólogo en su Informe de la Autopsia, estos orificios debieron haber sido el producto de dos armas de fuego de diferentes calibres. (Ver T.E. Vol. VI, págs. 43–206.)

Como cuarto y quinto testigos la defensa presentó a dos hermanas del acusado, Gloria y Georgina Prados García, las cuales testificaron en relación con las relaciones de familia habidas entre el acusado y la occisa, tratando de establecer la cordialidad de las mismas.

El apelante señala en apelación la comisión de once errores, a saber:

"1. Cometió error el Tribunal al no excusar motivadamente a la jurado, Sra. Ada Beauchamp, a solicitud de la defensa, por lo que, el apelante no tuvo un juicio imparcial y justo.

2. Cometió error el Tribunal al declarar sin lugar la moción de nuevo juicio.

3. Erró el Tribunal al permitir que se abriera el 'voir dire' con relación al jurado, Sr. Roberto Valés; que el fiscal lo interrogara nuevamente sin haber base para ello y luego lo recusara perentoriamente, todo ello con objeción de la defensa.

4. Cometió error el Tribunal al no dar instrucciones sobre homicidio voluntario según fueron solicitadas en un pliego que está unido a los autos.

5. El Tribunal erró al dar instrucciones sobre fuga porque éstas no se justificaban y las mismas fueron perjudiciales al acusado. (T. 21 Instrucciones.)

6. Erró el Tribunal al no dar las instrucciones marcadas del 2 al 10 en el pliego de instrucciones solicitadas por la defensa, que obra en autos.

7. Erró el Tribunal al no permitir cierta evidencia documental para fortalecer la capacidad del perito en balística, Sr. Camilo Arcelay.

8. Erró el Tribunal al permitir al Fiscal a que expusiera una teoría minuciosa en que hizo referencia a actos anteriores de violencia contra la interfecta inadmisibles atribuidos al acusado y que el Tribunal repitió al referirse a la teoría del fiscal

en el turno de resumen de la prueba al jurado y al permitir actos indirectos de agresión a través de la testigo, Sra. Tomasa Rivera, madre de la interfecta en cuanto a la insistencia del fiscal en llamar al Dr. Rivera Ayala en presencia del jurado para establecer .por inferencias, agresiones de parte del acusado a la interfecta.

9. Erró el Tribunal al permitir prueba a través del testigo de cargo, Ángel Luis Flores, al efecto de que en ocasiones anteriores al 2 de diciembre de 1964 y tan remoto como 1963 vio al acusado portando un revólver.

10. Erró el Tribunal al permitir que el patólogo declarara sobre materia propia para un experto en balística y para lo cual él no está cualificado.

11. Erró el Tribunal al dar por sentado que de creerse que el acusado hizo ciertas manifestaciones, las mismas constituirían una admisión." (T. 23, 24 Pieza VIII.)

Los errores apuntados no se cometieron.

■ (1-3) Discutiremos conjuntamente los tres primeros. En relación con el primer error señalado, el no excusarse motivadamente a la Sra. Ada Beauchamp, procede señalar en primer lugar que tanto la concesión o denegación de recusaciones motivadas dependen en gran parte de la discreción de la corte. *Pueblo* v. *Gallart*, 11 D.P.R. 377 (1906) ; *Pueblo* v. *Vázquez*, 68 D.P.R. 67 (1948). Al examinar la transcripción con relación al interrogatorio a que fue sometida .dicha jurado Beauchamp durante la desinsaculación ésta manifestó que durante las vacaciones escolares de mayo a agosto oyó comentarios en su casa de parte de su hija en relación con los hechos del caso pero que no le dio mucha importancia. Antes de esos hechos no había oído ninguna versión. Contestó que no formó ningún criterio a base de dicha versión y que además su hija no formuló opinión alguna sobre la inocencia o culpabilidad del acusado. A preguntas del juez declaró que si la prueba que surgiera en el tribunal fuera diametralmente distinta a la versión que le diera su hija ella tomaría como base para resolver la que desfilara ante el Tribunal y que no tomaría en cuenta la versión de su hija. No abusó

de su discreción el tribunal al denegar la recusación motivada de la jurado Beauchamp. Véase *Pueblo* v. *Rivera Romero* 83 D.P.R. 471, 477 (1961).

En relación a la moción de nuevo juicio, ésta se basó en la declaración jurada prestada por la jurado Angelita López de Román y de su testimonio en la vista en relación con la moción de nuevo juicio. En la declaración jurada esta jurado expresó que desde que quedó insaculado el jurado y antes de comenzar la presentación de prueba y durante el curso del juicio, la jurado Beauchamp y la jurado Julia Ríos de Maldonado y una jurado suplente expresaron opiniones adversas al acusado, sobre que éste había cometido el delito y que era culpable. Que además la jurado Beauchamp en más de una ocasión durante los recesos, expresó que la habían amenazado y que se lo iba a decir al juez. A preguntas del fiscal manifestó que familiares del acusado se le habían acercado y que estaba haciendo un favor y que si estaba equivocada había un juez allá arriba. Que en varias ocasiones las hermanas del acusado le pidieron ayuda y que ella le pidió a Dios que la iluminara. Aseguró que los alegados comentarios de las jurados no le afectaron en su ánimo al votar en favor de la culpabilidad del acusado de asesinato en segundo grado.

■ No erró el tribunal al declarar sin lugar la Moción de Nuevo Juicio. No se probó que se afectara la imparcialidad del jurado y menos todavía que lo relatado hubiese privado a los miembros del jurado en este caso del ejercicio de la razón y de su juicio sereno al juzgar los hechos ante ellos. Debe presumirse además que el jurado basó su veredicto en la prueba presentada y no en hechos extraños o bajo indebida influencia o presión. Entendemos que esta presunción no ha sido rebatida en el caso de autos. *Pueblo* v. *Díaz*, 74 D.P.R. 375 (1953) ; *Pueblo* v. *Emmanuelli*, 67 D.P.R. 667 (1947) y *Pueblo* v. *Báez*, 45 D.P.R. 512 (1933).

El tercer error ataca la discreción del tribunal al permitir que se abriera el *voir dire* con relación al jurado Roberto Vales, dando lugar a que el fiscal lo recusara perentoriamente y que vinieran otros jurados que a juicio del acusado no le eran aceptables. Basta con reafirmar la discreción del juez en relación con el proceso de selección e insaculación de jurados.

■ (4) Se plantea por el acusado el error del tribunal al no dar al jurado instrucciones sobre homicidio voluntario. Luego de examinar la prueba desfilada no hemos encontrado base para tales instrucciones, no existiendo prueba alguna de súbita pendencia o arrebato de cólera. La prueba estableció que el cambio de disparos entre el acusado y su suegro ocurrió después que el apelante había disparado contra su esposa.

En *Pueblo* v. *Serbiá*, 75 D.P.R. 394 (1953), expresamos a la pág. 398:

"Indudablemente, en un caso de asesinato, el tribunal sentenciador debe darle al jurado instrucciones de homicidio si de los autos surge alguna evidencia que justifique un veredicto de homicidio. [citas] Aun cuando esa evidencia sea escasa o débil, la misma debe apreciarse por el jurado y no por la corte. *Por otro lado, el tribunal sentenciador no debe transmitir instrucciones de homicidio si los autos están huérfanos de toda evidencia que justifique tal veredicto.* [citas] Permitir que subsista tal práctica equivaldría en efecto a permitir al jurado a imponer un castigo diferente a aquél prescrito para el delito que de hecho se cometió." (Énfasis nuestro.)

Véanse además los casos de *Pueblo* v. *Galarza*, 71 D.P.R. 557 (1950); *Pueblo* v. *Carrión*, 35 D.P.R. 901 (1926); *Pueblo* v. *Burgos*, 76 D.P.R. 199 (1954) y *Pueblo* v. *Barreto Pérez*, 85 D.P.R. 752 (1962).

Es por eso que el juez estuvo justificado en transmitir las instrucciones de acometimiento grave en el caso de ataque para cometer asesinato y que se negara a dar las de homicidio en el caso de asesinato.

■ (5) En relación con la instrucción sobre fuga si bien es cierto que es correcta en su texto y que en todo momento el juez la planteó como una cuestión de hecho, el hecho de si huyó o no, a ser dirimida por el jurado y que no tendrían que considerar ésta, si entendían que no había habido fuga, entendemos que dados los hechos del tiroteo posterior con el padre de la occisa y el corto tiempo que transcurrió entre su ida del lugar de los hechos y cuando se personó el acusado a donde Manuel Santos Aragón y luego al cuartel (alrededor de las 8:00 de la noche, habiendo ocurrido los hechos alrededor de las 7:30) eran improcedentes tales instrucciones de fuga bajo los hechos del caso. Pero a la luz de la abrumadora prueba de la culpabilidad del acusado, el haberla transmitido no tuvo efecto decisivo en el veredicto rendido.

(6) Apunta el apelante que no se transmitieron una serie de instrucciones solicitadas por la defensa. Hemos examinado éstas a la luz de la prueba presentada y nada hemos encontrado que sostenga la posición del apelante.

■ (7) Habiendo el fiscal aceptado la capacidad del perito presentado por la defensa no procedía la presentación de los documentos ofrecidos elogiando la labor del perito.

■ (8–9) La prueba presentada para sostener la acusación de asesinato es tan decisiva que aun si se considerara que constituyó error el permitir prueba sobre las relaciones tirantes existentes entre el acusado y su esposa, no justificaría la revocación de la sentencia. Lo mismo acontece con la prueba referente a portaciones de armas de fuego con anterioridad al día de los hechos.

(10) Los restantes errores no ameritan ser discutidos. *Se confirmará la sentencia apelada.*

El Juez Presidente Señor Negrón Fernández no intervino al igual que el Juez Asociado Señor Santana Becerra.