EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* VIRGINIO CRUZ PABÓN c/p PUCHO, acusado y apelante.

*Números:* CR-62–101, CR-62–102    *Resueltos:* 15 de marzo de 1963

*Yamil Galib Frangie,* abogado del apelante; *J. B. Fernández Badillo, Procurador General,* y *Nilita Vientós Gastón, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ MATOS emitió la opinión del Tribunal.

El Fiscal formuló ante la Sala de Mayagüez del Tribunal Superior, dos acusaciones contra Virginio Cruz Pabón. Una por el delito de "Asesinato Genérico", que luego El Pueblo siguió por "Asesinato en Segundo Grado", imputándose al acusado haber dado muerte a Sol María Santiago infiriéndole una herida grave de bala, el 1 de junio de 1960, en el Barrio Manantiales de Mayagüez. La otra por ataque para cometer asesinato, cometido en el mismo barrio y en la misma fecha, al inferirle a Patricio Caraballo Flores heridas de balas de carácter grave. Ambos casos fueron vistos conjuntamente ante un jurado que lo declaró culpable de los delitos de Asesinato en Segundo Grado y de Ataque para Cometer Asesinato. Solicitó nuevo juicio en cada caso el acusado y el Tribunal de instancia lo denegó. En el primer caso se le impuso una pena de doce a treinta años de presidio con trabajos forzados y en el segundo de tres a diez años de presidio con trabajos forzados. Apeló de ambas sentencias y de la resolución que le denegó la celebración de un nuevo juicio.

Para una mejor comprensión de los fundamentos de los recursos expondremos previamente los hechos principales de cada lado en la contienda, tales como, a juicio nuestro, han sido revelados por la prueba.

Virginio Cruz Pabón, conocido familiarmente con el nombre de "Pucho", persona de unos 40 años de edad, a la fecha del juicio—29 de noviembre de 1960—, de profesión comerciante, siempre ha vivido en el barrio Manantiales de Mayagüez, en una pequeña finca de su propiedad, donde ha mantenido su residencia y ha operado una tienda de comestibles. Contrajo primer matrimonio con Blanca Pagán por los años de 1940 a 1941. En él tuvo dos hijos, el mayor de los cuales tenía a la fecha del juicio unos diecinueve años. Blanca se fue para Nueva York y algún tiempo después escribió a Virginio diciéndole "Tengo otro marido acá." Se divorció de Blanca. Por el año 1952 se enamoró de Sol María Santiago, agraciada muchacha de 16 años de edad, vecina del barrio. Sin casarse con ella, se la llevó a vivir a su fin-

quita y allí convivieron como marido y mujer hasta el mediodía del 1 de junio de 1960, en que él la privó de su vida con un certero disparo. En esta segunda unión el acusado tuvo dos hijos más.

La tienda daba frente a una carretera y estaba a unos "cuatrocientos pies" de la residencia. Virginio la atendía todo el día; allí siempre tomaba el almuerzo y la cena que le preparaba Sol María Santiago en su casa, a la que regresaba entre nueve y once de la noche.

Por disgustos entre ellos, hacía unos cuatro meses que Sol María dormía en una pequeña casa cercana a la residencia principal. Por las mañanas se levantaba, iba a la residencia, hacía todas las labores domésticas del día y al entrar la noche se iba a dormir a la casita contigua.

El 1 de junio de 1960, Sol María le pidió a un muchacho del barrio, vecino y amigo de la casa, llamado Patricio Caraballo Flores, conocido por Tito y por "El Gordo", de unos 14 años de edad, que fuera a su casa para que le escribiera una carta para una hermana que estaba en Nueva York. Con ese fin y cerca del mediodía llegó el muchacho a la casa, llevaba puesto solamente el pantalón y nada le cubría su torso. En esos momentos allí se encontraban los dos nenes de la casa, una sobrina del acusado, un hermano de éste y Sol María. Se le invitó a almorzar; se sentó frente a una mesa del comedor y le sirvieron unas sopas que empezó a tomar.

Mientras tanto Sol María preparó el almuerzo del acusado y se lo envió a su tienda con una persona llamada Emeterio Seda Acevedo, conocida por "Vilella." Cuando Seda llegó a la tienda con el almuerzo le informó al acusado que en su casa estaba Patricio Caraballo, "El Gordo." Al recibir esa información, el acusado no quiso el almuerzo, lo devolvió a su casa con "Vilella", cerró la tienda y se fue directamente para su casa. Al llegar a ésta lo saludó Caraballo que seguía sentado a la mesa; no le contestó el saludo, tomó un revólver de un ropero y le hizo dos disparos a Caraballo causándole dos heridas, una en la mano derecha y la otra

en la parte derecha posterior del pecho. En seguida se dirigió hacia la cocina y allí le hizo un disparo a Sol María por el pecho que le causó instantáneamente la muerte. Poco después fue al Cuartel de la Policía de Mayagüez donde le dijo al detective Jobo Santiago Rodríguez "Me vengo a entregar. Acabo de matar a mi esposa." En esa misma tarde, prestó una declaración ante el fiscal, "libre y espontáneamente . . . sin coacción y sin amenazas", según estipulación en juicio de las partes, relatando lo ocurrido.(¹)

---

(¹) Dice, textualmente, esa declaración (Ex. 9 del Pueblo) así:

"Exhibit Núm. 9 de El Pueblo de Puerto Rico.—

"En el Tribunal Superior de Puerto Rico, Sala de Mayagüez—Oficina del Fiscal—El Pueblo de Puerto Rico vs. Virginio Cruz Pabón (c/p Pucho) —Crim. Núm.—Por: Asesinato Genérico y Ataque para cometer asesinato. —Investigación practicada por el Fiscal, Hon. Luis Angel Limeres, del Tribunal Superior de Puerto Rico, Sala de Mayagüez.—Virginio Cruz Pabón (Declara bajo juramento) Examinado por el Fiscal Hon. Luis Angel Limeres, el día 1ro. de junio de 1960.—

"¿Cuál es su nombre?—Virginio Cruz Pabón.—¿Dónde vive?—Manantiales, Mayagüez.—Levante la mano derecha, ¿jura decir la verdad y nada más que la verdad?—Sí señor.—Se le advierte que a usted se le está investigando en relación con la muerte de la señora Sol María Santiago y la agresión perpetrada en la persona de Patricio Caraballo Flores conocido por El Gordo, hoy día 1ro. de junio de 1960, como a eso de la 1:15 de la tarde y en el barrio Manantiales de Mayagüez. Se le advierte, asimismo, que usted tiene derecho a declarar o a no declarar y que todo lo que usted declare ante mí podrá ser utilizado en favor o en contra suya. Hechas estas advertencias, le pregunto, si alguna persona lo ha obligado a usted a declarar . . . —No, señor. —Si alguna persona lo ha amenazado a usted para que declare.—No, señor.—Si alguna persona lo ha amenazado a, digo, le ha hecho a usted alguna promesa para que usted declare. —No, señor.—¿Entonces, lo que usted va a declarar es de su libre y espontánea voluntad?—Sí, señor, lo cierto.—¿Usted conocía a Sol María Santiago?—Esposa mía.—¿Usted era casado con ella?—No, señor.—¿Pero vivía con ella hacía qué tiempo?—Como 8 años.—¿Había tenido hijos con ella?—2 hay.—¿Vivía últimamente con Sol María ahí en el barrio Manantiales de Mayagüez?—Sí, señor.—¿Qué tiempo hacía que vivía ahí?— —8 años.—¿Usted conocía a Patricio Caraballo Vélez conocido por el Gordo?—De vista.—¿Qué tiempo hacía que vivía por ahí él?—Como un año.—Hoy día 1ro. de junio de 1960 y como a eso de la una y cuarto de la tarde, usted estaba en su tienda?—Sí, señor.—¿Bajó de su tienda a su casa?—Salí a la casa de la tienda al decirme el señor ese eso.—¿Qué le dijeron a usted?—Que en casa estaba comiendo el Gordo.—¿Quién fue que le dijo a usted que en su casa estaba comiendo el Gordo?—Vilella, uno que come en casa.—¿Al decirle Vilella que en su casa estaba El Gordo, qué usted hizo?—Cerré la tienda y fui a casa.—¿Cómo a qué distancia

El Dr. Luigi atendió a Caraballo; le removió la bala y lo dio de alta el 17 de junio de 1960, en condición de "Mejorado." El doctor Judzy practicó la autopsia del cadáver de Sol María Santiago, entre las tres o cuatro de la tarde

queda la tienda de su casa?—Como de aquí a la Plaza de Colón.—¿Subiendo?—Sí, señor.—¿Qué hizo usted al llegar a su casa?—Yo llegué a casa, cogí el revólver del ropero, le tiré a él y le tiré a ella, porque ella me había dicho que tenía otro macho.—¿Al primer sitio que usted fue fue al ropero de su casa?—Sí, señor.—¿Entonces desde que salió de la tienda fue con la idea de coger el revólver?—Ideas de comer en casa y ver quién había en casa.—¿Cuándo fue que usted se decidió a coger el revólver? —Cuando yo veí el hombre comiendo en la mesa del comedor de mi casa.— ¿La mujer suya dónde estaba?—En la cocina.—¿La mujer suya en ese momento estaba vestida?—Sí, señor.—¿Tenía un pantalón color amarillo? —Sí, señor.—Y una blusa color azul?—Yo no me di cuenta del color de la blusa.—¿Cuando usted llegó, dice que Patricio estaba en el comedor y ella en la cocina?—Sí, señor.—¿Usted tuvo palabras con Patricio en ese momento?—No señor, con ninguno.—¿Ni con Sol María?—Tampoco.—¿Alguien trató de atacarlo a usted en ese momento?—No, señor.—¿Cuando Vilella le dijo a usted que el Gordo estaba en su casa comiendo, usted no llegó a sospechar de que su mujer le pudiera ser infiel con El Gordo?— Sí, señor.—¿Usted, entonces, no fue bajo esa impresión a su casa de que ella le pudiera ser infiel con El Gordo?—Yo fui tranquilo a casa en el momento.—¿El revólver que usted dice que sacó del ropero es este revólver que tiene el número de serie 18177, niquelado, marca U.S. Revólver, con cachas blancas?—Sí, señor.—¿Este revólver está registrado a nombre suyo? —Sí, señor.—¿Cuántas balas tenía el revólver en ese momento?—5 balas. —¿Cuántos disparos le hizo usted a Patricio?—Uno.—¿Y a Sol María?— Dos.—¿Qué hizo usted después de haberle hecho los disparos a Patricio y después de haberle hecho los disparos a Sol María?—Me vine a entregar a la Policía.—¿Recuerda usted si encontró por el camino al fiscal Eugenio Alemañy?—Sí, señor.—¿Le dijo algo al fiscal Alemañy cuando se encontró por el camino con él?—Me pasó que yo le di unos tiros a uno que estaba en casa y a la señora, pero no sé si la he herido.—¿Después de encontrarse usted con el fiscal Alemañy, siguió usted hasta el Cuartel de la Policía?—Sí, señor.—¿Entonces allí se entregó en el Cuartel de la Policía?—Sí, señor.—¿Allí entregó usted el revólver?—Sí, señor.—¿Usted recuerda con quién habló en el cuartel de la Policía?—Hablé con el jefe.— ¿Le dijo usted al Jefe de la Policía lo que había hecho?—Sí, señor, lo que había pasado.—¿Usted no había ido a su casa desde esta mañana que salió de allá?—No, señor, no había ido.—¿Usted acostumbraba ir a almorzar a su casa o de su casa le mandaban el almuerzo a la tienda?—Sí, señor, con el mismo Vilella ese.—¿Entonces usted fue a almorzar hoy a su casa porque le dijo Vilella que estaba El Gordo en su casa?—Fui a almorzar a casa y cuando lo veí en el comedor almorzando . . . —¿Entonces no llegó a almorzar en su casa?—No señor, ni he almorzado todavía. No he tomado ni café que es lo menos.—¿Qué edad tiene usted?—Cuarenta años.—¿Y Sol María qué edad tenía?—24 años.—¿Había dudado usted en algún momento

del mismo día. Le encontró una herida de bala en la parte anterior del pecho, hacia la parte izquierda de la línea central; extrajo la bala del cuerpo; la causa de la muerte, según su testimonio fue "Hemorragia masiva debido al paso de una bala a través del corazón." Como parte de la autopsia el Dr. Judzy examinó la genitalia, tomó muestras del líquido que había en la vagina, las examinó y las encontró normales, sin que hallara rastros ni indicaciones de que la finada hubiera sostenido relaciones sexuales ese día.

La evidencia de la defensa tendió a demostrar que Sol María Santiago, entonces de 24 años de edad, era una mujer agresiva, que una vez había "corrido con un cuchillo" a Virginio; que en otra ocasión ella le había hecho dos disparos con el mismo revólver y que lo insultaba y lo maltrataba con lenguaje soez; que cuando Virginio llegó ese día a

de la fidelidad de ella?—Al decirme ella que tenía otro macho tenía la duda.—¿Cuándo se lo había dicho ella por última vez?—A cada momento me lo estaba diciendo.—¿Le había dicho ella eso a usted delante de alguna otra persona?—No, a mí solo.—¿En ese momento en que usted le hizo los disparos a Patricio y a Sol María había alguna otra persona en su casa?—Los nenes nada más. La sobrina y dos nenitos que tengo en ella. —¿Dónde estaban esos nenes?—Arriba.—¿Cómo se llama el mayor?—Norberto Cruz y Nancy la otra.—¿Qué edad tiene Norberto?—Seis años.—¿Y Nancy?—Cinco.—¿A qué distancia le hizo los disparos a Sol María?— Como a 4 pies.—¿Y a —Patricio?—Como a 3 pies.—¿Patricio estaba sentado en el momento que usted le hizo los disparos?—Comiendo estaba y se paró cuando yo llegué.—¿A pesar de que allí en la cocina habían cuchillos y eso, en ningún momento ninguno de ellos trató de agarrar un cuchillo de esos para acometerlo a usted?—No, señor.—¿Usted se sentía molesto y sentía que le trabajaba a usted la mente desde que Sol María le había dicho que ella tenía otro macho?—Sí, señor, y que yo era un cabrón.—Y cuando Vilella le dijo eso hoy, usted corrió para su casa seguida?—Fui a casa pero sin intenciones malas ningunas.—¿Quiere declarar algo más con relación a estos hechos?—Ella me decía, siendo la casa mía, que me fuera de la casa para ella traer el macho que ella quisiera.—¿Algo más que quiera declarar?—Nada más.—CERTIFICACIÓN. Yo, Rafael Rivera, taquígrafo de la Fiscalía del Tribunal Superior de Puerto Rico, Sala de Mayagüez, CERTIFICO: Que lo que antecede es una transcripción fiel, exacta y correcta de las notas taquigráficas tomadas por mí el día 1ro. de junio de 1960, con motivo de la declaración jurada prestada por el acusado, Virginio Cruz Pabón conocido por Pucho, ante el Fiscal, Hon. Luis Angel Limeres, durante la investigación de este caso.—Mayagüez, P. R., a 20 de julio de 1960.—(f) Rafael Rivera-Taquígrafo."

—(T. E., págs. 168–174.)

su casa, Sol María le dijo a Caraballo, "El Gordo", desde la cocina que le hiciera frente a Virginio y que fue entonces, cuando Caraballo se levantó "con un carácter para tirárseme encima", que él, el acusado, "le echó mano al revólver que estaba sobre el ropero y le hice dos disparos a él y a ella." (²)

Por su primer señalamiento sostiene el acusado y apelante que erró el Tribunal a quo al decir cuando resumía la evidencia para el jurado, que el acusado había declarado, a preguntas del Fiscal, que había salido de la tienda con el propósito de arreglar cuentas con Patricio Caraballo Flores.

■ El juez de instancia, en el curso de sus instrucciones, hizo un amplio y bien ajustado resumen de todo el testimonio del acusado.   Es verdad, como afirma el apelante, que, casi al terminarlo, entre otras cosas, le manifestó al jurado: "Dijo también (refiriéndose a la declaración en juicio del acusado) que él había salido de la tienda con el propósito de arreglar cuentas con el Gordo."   Del récord resulta que dijo lo contrario.   (T. E. pág. 319.)

No creemos, sin embargo, que esas palabras del Juez, considerado en conjunto el resumen del testimonio del acusado, y su confesión ante el Fiscal, llevaran al ánimo del jurado actos, aptitudes, conducta o disposición del acusado distintos a los que se desprenden o infieren de la integridad de ese testimonio y esa confesión.   La parte de la declaración del acusado, a este respecto, es como sigue:

---

(²) La versión del acusado, en el acto del juicio, sobre "lo que sucedió", es como sigue:
   "Testigo: El día primero de junio, como a las doce y media del día, vino el señor Vilella y me trajo el almuerzo y me dijo que allá estaba 'El Gordo' desnudo del pantalón para arriba, sin camisa ni camiseta.   Yo le dije estas palabras: 'Llévese el almuerzo para casa que yo voy a almorzar a casa.   Yo voy a almorzar a casa.'   Bueno, cerré la tienda y me fui derecho para casa.   A almorzar a mi casa. Cuando llegué a mi casa me encontré el 'Gordo' sentado en una silla almorzando, desnudo, y cuando dice '¿Qué pasa, Pucho?', le digo 'No pasa na.'   Entonces, cuando Sol María Santiago desde la cocina dice 'Echa palante, Gordo', yo eché mano al revólver que lo tengo encima del ropero, le hice dos disparos a él y a ella."   (T. E. pág. 261.)

"FISCAL: ¿Y por ese hecho de que cuando llegó a la tienda Vilella el día primero de junio, que le dijo que allí estaba el Gordo . . . ? ¿Por qué usted corrió de la tienda en seguida?

"TESTIGO: Para ver quién era el que estaba en casa almorzando.

"¿Usted se imaginó que el gordo que le había dicho Vilella era el mismo gordo de que le había hablado Sol María?

"Sí, señor.

"¿Entonces usted, cuando salió de la tienda que Vilella le dijo a usted que allí en su casa estaba el gordo, usted creyó que el gordo que estaba en su casa era el mismo que le había hablado Sol María?

"Era el mismo.

"¿Y entonces usted se dispuso a ir hasta su casa a arreglar cuentas con el gordo?

"El gordo era el que estaba allí.

"¿Usted se dispuso a ir a arreglar cuentas con el gordo?

"Yo no iba a arreglar ningunas cuentas con él.

Yo no iba a arreglar con él cuentas ningunas." (T. E. pág. 282.)

Realmente fue una inadvertida manifestación del tribunal a un jurado que oyó directamente todo el testimonio oral que desfiló en el juicio. El letrado defensor tuvo amplia oportunidad de llamar la atención sobre ella al Tribunal cuando anotaba una serie de excepciones a las instrucciones, (T. E. págs. 354-359) pero no lo hizo. En casos análogos hemos resuelto que, generalmente, el hecho de que el juez ponga en boca de un testigo palabras que no dijo durante el juicio no constituye motivo suficiente para anular el veredicto.—*Pueblo* v. *Díaz*, 19 D.P.R. 520 (1913); *Pueblo* v. *Cruz*, 78 D.P.R. 80 (1955); *Pueblo* v. *Lampón*, 78 D.P.R. 109 (1955); *Pueblo* v. *Román*, resuelto por sentencia el 27 de octubre de 1961.

Como segundo error señala el apelante el "negarse a admitir prueba consistente en manifestaciones hechas por la finada Sol María Santiago al testigo Francisco Acevedo Seda." Carece de méritos este señalamiento. El acusado intentó llevar al ánimo del jurado la impresión de que Sol María era una mujer liviana y la opinión que ella tenía del

acusado, por medio del testimonio de Francisco Acevedo, obrero que un mes antes de la tragedia, había hecho ciertos arreglos en la instalación eléctrica de la residencia. Este testigo manifestó que en aquella fecha, luego de terminar de reparar una lavadora que se encontraba en el balcón de la casa, Sol María le requirió para que arreglara además "otro zócalo dentro", y que él, al verla a ella en "malas ropas" y no estar Virginio allí en la casa, no se atrevió a hacer el trabajo dentro de la casa porque él era un hombre de respeto, y que entonces Sol María se manifestó en forma despectiva acerca del acusado. Se opuso el Fiscal a que se trajeran esas remotas expresiones de la víctima, que nada tenían que ver con los sucesos del 1 de junio de 1960 y el Tribunal—que había retirado al jurado mientras se discutía la admisibilidad del testimonio de Acevedo respecto a las manifestaciones de la occisa en aquella ocasión—se negó, a nuestro juicio acertadamente, a admitirlas, expresándose, en parte así:

" . . . Porque aquí lo que se pretende traer es un *outcry* de un hecho anterior, o sea, manifestaciones anteriores a los hechos. Con anterioridad a los hechos que tienen un lapso de un mes con anterioridad. Si abrimos esa . . . A juicio del Tribunal, si abrimos esa puerta, se podrían traer innumerables situaciones aquí que harían interminable el proceso y además podría . . . es el temor que tiene el Tribunal que estuviera admitiéndole prueba a la defensa o prueba al Fiscal que no sea necesaria o que pueda ser inadmisible. Desvía la atención del jurado de los hechos que realmente se han cometido." (T. E. págs. 229–230.)    (Alegato del Pueblo, pág. 5.)

■ Hizo buen uso de su discreción el Tribunal al denegar la admisión de manifestaciones atribuidas a una persona fallecida, porque además de no tratarse de manifestaciones de referencia comprendidas dentro de las excepciones ya admitidas en derecho, ello abría la investigación, dentro del juicio, de un hecho accesorio, sin relación alguna con la cuestión en controversia y que no era necesario para su debida

determinación, ni afectaba la credibilidad de un testigo.— Art. 396, Código de Enjuiciamiento Civil.

El tercer señalamiento imputa error al Tribunal a quo "al instruir al jurado que estaba obligado a resolver los casos por la prueba desfilada sin tomar en cuenta los argumentos sobre pasiones."

Las instrucciones aludidas son las siguientes:

"Llamo la atención a ustedes sobre estos casos en particular. Estos casos donde están envueltas pasiones por lo general sirven para argumentar en diferentes formas. Ustedes están obligados a resolver estos casos por la prueba desfilada sin tomar en cuenta los argumentos sobre pasiones y sin llegar a prejuiciarse contra una u otra parte. Deben hacer un análisis de la prueba fría y serenamente teniendo en mente los hechos que ustedes estimen probados y la ley que se aplique a esos hechos que ustedes hayan estimado que han quedado probados."

Tal instrucción no es equivalente, como sostiene el apelante, "a ordenar al jurado no tomar en cuenta la argumentación del abogado del acusado con respecto a un extremo esencial de la prueba y los hechos del caso", ni a privar al acusado de su derecho constitucional a estar asistido de abogado. Sencillamente hacía énfasis con ella el Tribunal sobre la obligación del jurado de resolver la culpabilidad o inocencia del acusado y la calificación del delito cometido, exclusivamente por la prueba desfilada, luego de un sereno y frío análisis de los hechos que estimaran probados, sin prejuicios contra una u otra parte. Les dio a entender que las argumentaciones del Fiscal o de la defensa no constituían evidencia.

Como el propio abogado defensor admite, tanto él como el Fiscal argumentaron cuanto quisieron, sin objeciones entre sí "o intervención del magistrado." En varias ocasiones éste instruyó al jurado sobre el homicidio y sus clases; sobre la súbita pendencia, sobre el arrebato de cólera (*heat of passion*), la provocación y la distinción entre el asesinato

y el homicidio. (³)

Respecto al caso de ataque para cometer asesinato dio instrucciones sobre el delito de acometimiento y agresión en sus dos clases.

■ Tiene el Tribunal de instancia, por ley, la obligación de llamar la atención del jurado hacia la cuestión esencial a resolver y puntos principales en discusión y la prueba practicada para sostenerlos, "con las observaciones que estime necesarias para el gobierno del jurado. . . ."—Art. 233(8), Código de Enjuiciamiento Criminal.

Las circunstancias concurrentes en este caso no ofrecen sólida base para considerar tal error como motivo de revocación, aun aceptando como correcta la interpretación que da el apelante a esa parte de las instrucciones. La declaración jurada dada voluntaria y espontáneamente al Fiscal, pocas horas después de la muerte de Sol María, no revela la existencia de algún hecho o acto capaz de hacer perder el dominio de sí mismo a un hombre de temperamento corriente, ni la ocurrencia de alguna provocación que lo impulsara a matar sin la debida reflexión y sin formar un propósito determinado.

---

(³) Sobre este punto, se expresó así el Juez de instancia:

"Debo decirles que dentro de una acusación por el delito de asesinato el jurado puede declarar al acusado culpable de un delito de homicidio voluntario si la prueba así lo justifica. Por eso hemos de definir qué es homicidio.

"Homicidio es dar muerte ilegal a un ser humano sin que medie malicia expresa o implícita y sin ninguna clase de deliberación. El homicidio es de dos clases: voluntario e involuntario, siendo voluntario cuando ocurre con ocasión de una súbita pendencia o arrebato de cólera. Pendencia significa contienda, riña, disputa y súbita pendencia la que surge de momento, repentina o inesperadamente. Arrebato de cólera significa un ataque de ira, enfado o coraje que surge de momento con motivo de una provocación.

"Para que la provocación reduzca el delito de asesinato a homicidio, aquélla debe ser de tal grado que haga perder el dominio de sí mismo a un hombre de temperamento corriente y lo obligue a actuar por el impulso del momento producido por la provocación, sin la debida reflexión y sin formar un propósito determinado." (T. E. págs. 328, 329.)

Según esa declaración, hacía como un año que el acusado conocía a Caraballo, aunque dijo que era "de vista"; estaba en su tienda cuando le llevan el almuerzo; al decirle Vilella que "El Gordo" estaba comiendo en su casa, cerró la tienda, se dirigió a su casa; encuentra en ella a sus dos nenes y a su sobrina, a Patricio "El Gordo", que estaba sentado a la mesa almorzando, y a Sol María que estaba en la cocina; no tuvo palabras allí, en ese momento con persona alguna, ni con Patricio, ni con Sol María; en ningún instante persona alguna tomó o trató de tomar alguno de los cuchillos que habían en la cocina para agredirlo; a pesar de todo ello al primer sitio que va es al ropero y, entonces, "cogí el revólver del ropero, le tiré a él y le tiré a ella, porque ella me había dicho que tenía otro macho." El disparo a Sol María lo hizo a cuatro pies de distancia, de frente, los dos a Patricio, a tres pies, uno de ellos por la espalda y mientras Patricio trataba de huir. (T. E. págs. 168–174.)

Sin duda alguna, la significación obvia de esos hechos, declarados por el propio acusado cuando todavía no había sido detenido por la injustificada muerte de su joven compañera, difícilmente hubiera sido diluida por la más impresionante arenga forense sobre las pasiones humanas. Si alguna vez estuvo seriamente el jurado ante la alternativa de escoger entre el calificativo de asesinato en segundo grado y el de homicidio voluntario, la selección que hizo no descansó en el fragmento de instrucción de que se queja el apelante.

Hemos examinado los casos de *Ambach* y *Tucker*, citados en su alegato. Como sostiene El Pueblo, ambos casos de violación, presentan situaciones de hecho muy distintas a la del presente recurso.

Consideramos sin mérito alguno el cuarto señalamiento que se formula en los siguientes términos:

"CUARTO ERROR.—Erró el Tribunal a quo al dar instrucciones extensas sobre el delito de Asesinato en Primer Grado que no era uno de los delitos imputados al acusado, al informar in-

necesariamente al jurado que bajo la acusación originalmente radicada cabía una convicción de Asesinato en Primer Grado, pero que el Fiscal había optado por no acusar por ese delito, y al dar lectura al jurado de la acusación en la forma que había sido radicada originalmente."

Dispone el Art. 266 del citado Código de Enjuiciamiento Criminal que "Al formular al jurado el resumen de lo que se somete a su deliberación, el tribunal deberá manifestarle todos los puntos de derecho necesarios para su información." La acusación a que dio motivo la muerte de Sol María fue por Asesinato Genérico. Basta un mero examen de su texto para comprender que imputaba los elementos necesarios para seguir el caso bien por asesinato en primer grado o bien por asesinato en segundo grado. Como dijimos en *Pueblo* v. *Pérez Martínez*, 84 D.P.R. 181 (1961), "el asesinato constituye un solo delito que se divide en grados en atención a la perversidad demostrada por el acusado y al solo efecto de la imposición de la pena" y que "es lógico concluir que la prueba para sostener una convicción por el delito de asesinato ya sea en uno u otro grado, es generalmente la misma."

Al ser llamado el caso Criminal Núm. G–60–160 para juicio, el Fiscal anunció al tribunal que se proponía seguirlo por el delito de asesinato en segundo grado. Del récord aparece que "la Secretaria lee la acusación por asesinato en segundo grado." (T. E. pág. 3.) Al terminar el Fiscal la exposición de su teoría le informó al jurado que si él lograba probar los hechos que imputaba al acusado, les iba a pedir que trajeran un veredicto "de asesinato en segundo grado por la muerte de Sol María Santiago." (T. E. pág. 7.)

En el curso de sus instrucciones el Juez de instancia informó al jurado, entre otras cosas: (1) que ante ellos pendían dos casos, uno de ellos por asesinato en segundo grado; (T. E. pág. 298) (2) que se trataba "de un caso de asesinato en segundo grado, según alega el Fiscal"; (3) que el jurado debía entender a "ver . . . en particular qué es asesinato en segundo grado"; (T. E. pág. 320); y (4) que

". . . En este caso no es cualquiera de sus grados, como ya les he explicado, si no es en segundo grado que es el delito por el cual se está acusando a este acusado ya que así lo escogió el fiscal cuando anunció al Tribunal que se proponía probar un delito de asesinato en segundo grado aun cuando la acusación rezaba 'Asesinato genérico'. Está titulado 'Asesinato genérico' y el asesinato genérico puede incluir cualquiera de las dos clases de asesinato. Se puede probar cualquiera de los dos. El fiscal alegó que iba a probar asesinato en segundo grado y ustedes tienen que considerar a los fines de este caso de asesinato el asesinato en segundo grado solamente." (T. E. pág. 328.)

Al instruir al jurado sobre los posibles veredictos a rendir, se incluyó en primer término, y como el más grave, el de "asesinato en segundo grado." (T. E. pág. 345.) Ya sabemos que el veredicto fue por asesinato en segundo grado. (T. E. pág. 361.)

▇ Ante ese cuadro de circunstancias, carece de finalidad práctica discutir si cometió error el Tribunal a quo al definir y diferenciar, con suma claridad y precisión, los conceptos jurídicos de los delitos de asesinato genérico, asesinato en primer grado y asesinato en segundo grado.

También hemos examinado los casos de *Mitton* y *City*, citados por el apelante. El primero es por el delito de falsificación de un instrumento público y el segundo por ataque con intención de matar, habiéndose dado instrucciones al jurado en ese segundo caso por otro delito no incluido o relacionado en la acusación.

Los señalamientos quinto y sexto se discuten conjuntamente. El quinto expone que erró el Tribunal a quo al instruir al jurado con respecto al elemento de malicia premeditada y la prueba requerida para su comprobación; el sexto, que se cometió al instruir respecto a los diferentes delitos comprendidos en las acusaciones y los elementos integrantes de los mismos.

El apelante sólo ha dedicado la mitad de la página 8 de su alegato a la discusión de estos dos supuestos errores. Todo lo poco que allí expone, respecto al quinto, consiste en

"señalar" que el Tribunal "indicó al jurado que se presume la malicia tácita, y la misma, al igual que la intención de matar, se deduce del hecho delictivo en sí", y que ello colocó sobre los hombros del acusado "el peso de la prueba de circunstancias y hechos que venzan dicha presunción." Respecto al sexto se permite también "señalar" que el Tribunal a quo, en sus instrucciones sobre los delitos de homicidio voluntario y ataque para cometer homicidio, utilizó un lenguaje que obligaba al jurado a "rendir un veredicto por Asesinato."

■■ Estos señalamientos generales nos han obligado a escudriñar extremada y repetidamente las 56 páginas de la transcripción que contienen las instrucciones trasmitidas. No existe base en la misma para fundamentar seriamente esos señalamientos. No es aconsejable la práctica corriente de forjar señalamientos a base de meros términos o simples frases usadas por el Tribunal al instruir al jurado. No debe olvidarse que para determinar el efecto o impacto en la mente del jurado de un término o de una frase debe tenerse en cuenta la totalidad de las instrucciones.

■ No es justo para el Juez de instancia imputarle la comisión de un error valiéndose de un fragmento de una instrucción e ignorando el resto de la misma, como en este caso en que se nos da la impresión de que el Juez, a secas, le indicó al jurado que se presume la malicia tácita, cuando el contexto de la instrucción correspondiente es así:

"La malicia premeditada puede ser de dos clases: expresa o tácita. Es expresa cuando se manifiesta el propósito de quitar la vida a un semejante. Así dicha malicia expresa existe cuando una persona serena y fríamente y con propósito deliberado da muerte ilegal a otra. Tal propósito se demuestra por circunstancias exteriores capaces de revelar y descubrir la formada intención del delito. Es tácita cuando no resulta notable provocación de parte de la víctima o cuando, sin manifestaciones de propósito deliberado, las circunstancias que concurren a la muerte demuestran un corazón pervertido y maligno. La malicia tácita se deduce del hecho delictivo, considerado en sí mismo y así, cuando la muerte de una persona resulta evidente

y no hay ninguna circunstancia en la prueba que tienda a mitigar, excusar o justificar el acto ejecutado, entonces se presume la existencia de la malicia tácita." (T. E. págs. 320–321.)

Precisamente, en el caso de *El Pueblo* v. *Túa*, 84 D.P.R. 39 que resolvimos el 27 de noviembre de 1961, y que cita el apelante, entre otras cosas, dijimos:

" . . . La malicia premeditada es un elemento *de hecho* a ser hallado por el jurado, pero siendo un ingrediente mental o subjetivo, allí donde no se ha manifestado la intención deliberada de quitar ilegalmente la vida le es permisible al jurado inferirla o deducirla como un hecho de los demás actos y circunstancias que rodean la perpetración de la muerte o relacionados con ésta, una vez instruido en ley que la malicia denota un acto dañoso e intencional, *sin justa causa o excusa,* en perjuicio de otro. El Pueblo, no obstante, viene obligado a producir aquellos hechos y circunstancias de donde el jurado pueda hacer una inferencia racional. . . ."

El séptimo y último error se formula así:

"SEPTIMO ERROR.—Erró el Tribunal a quo al instruir *motu proprium* al jurado de que en Puerto Rico no existe teoría de la defensa del honor, cuando dicha teoría no fue expuesta, alegada, intentada probar ni argumentada por la defensa."

Lo consideramos el más frívolo de todos los señalados. Las palabras del Tribunal a quo a que alude el señalamiento son las siguientes:

"Quiero instruirles, además, a las damas y caballeros del jurado que en Puerto Rico no existe tal cosa como la defensa del honor; que nadie está justificado en Puerto Rico a matar porque se le haya manchado su honor, o sea, la defensa del honor y de la dignidad del individuo no está consagrada en nuestro Código como una razón para quitar la vida a un ser humano. Ya la cuestión no es la defensa propia, o sea, la defensa de él—del acusado—como persona que fue atacada y podía recibir la muerte o recibir grave daño corporal. Entonces se aplicaría la defensa propia. O si dentro de las circunstancias que rodean el caso había razonable base para creer que iba a ser atacado o que lo iban a matar o que iba a perder su vida o que iba a sufrir grave daño corporal y entonces es cuando sería de aplicación la defensa propia, pero por motivos de honor no se aplica la defensa propia."

■ Como bien sostiene El Pueblo en su alegato el claro propósito de esta instrucción fue el de distinguir entre lo que corrientemente se conoce por defensa del honor y lo que comprende el derecho de legítima defensa definido en el Art. 209, inciso 3, de nuestro Código Penal. El acusado no nos ha convencido en qué forma esa instrucción "tuvo el efecto de desacreditar las legítimas defensas del acusado." Oportunamente el Juez de instancia instruyó al jurado sobre la legítima defensa propia y la prueba que para sostenerla adujo el acusado. Puede argumentarse que en el caso no era necesario trasmitirla; pero su trasmisión no ocasionó, a juicio nuestro, perjuicio alguno al apelante.

Por los motivos expuestos deben confirmarse las sentencias condenatorias apeladas.

El recurso contra la resolución de fecha 27 de diciembre de 1960 que denegó la concesión de un nuevo juicio, de hecho ha sido abandonado por el acusado apelante. Los fundamentos para tal recurso no se exponen, ni mucho menos se discuten en parte alguna de su alegato. *Esa resolución debe confirmarse, ya que como razones o motivos para solicitar el nuevo juicio se expusieron, sustancialmente, casi todos los fundamentos de error aducidos en el recurso principal.*