EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* FÉLIX DÍAZ ALICEA, acusado y apelante.

*Número:* CR-64-42      *Resuelto:* 19 de febrero de 1965

*Elí B. Arroyo,* abogado del apelante ; *J. B. Fernández Badillo, Procurador General,* y *Rodolfo Cruz Contreras, Procurador General Auxiliar,* abogados de El Pueblo.

Sala integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Rigau y Dávila.

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

El apelante fue acusado de un delito de asesinato consistente en haber atacado con un machete a Nin Flores Coriano, infiriéndole varias heridas a consecuencias de las cuales falleció. Un jurado le declaró culpable de asesinato en segundo grado y fue sentenciado a cumplir de 15 a 25 años de presidio.

En el único error señalado en este recurso se ataca la corrección de ciertas instrucciones trasmitidas al jurado. Para la breve discusión de este error es necesario hacer primero un resumen de la prueba pertinente.

La de cargo consistió en los testimonios de doña Bertila Vázquez Rivera y don Agapito Coriano, madre y padre respectivamente de la víctima Nin Flores Coriano, y en el del policía que investigó los hechos quien identificó una fotografía que fue admitida en evidencia. Además se admitió por estipulación el protocolo de la autopsia de la víctima.

El resumen del testimonio de doña Bertila Vázquez fue hecho por el tribunal, de la siguiente manera:

" . . . Esa señora, Bertila Vázquez, declaró ser la madre del occiso Nin Flores Coriano y dijo que el día de los hechos, el día 17 de octubre de 1960 su hijo Nin, el occiso, se levantó y como a las nueve y media le preguntó a ella donde estaba su padre, Don Agapito. La madre le contestó que estaba cogiendo café y él decidió ir a ayudarlo. La madre, la testigo, dice que entonces se puso a preparar un café para enviarle a Don Agapito, su esposo y padre a la vez del interfecto Nin Flores Coriano, para que Nin lo llevara a su padre; pero que al terminar de preparar el café resultó que ya Nin se había ido y entonces, ella, la testigo, como en ocasiones anteriores, se dispuso a llevar ella misma el café al sitio donde Don Agapito estaba recogiendo café en la finca de ellos. Declaró ella que de la casa al sitio donde recogían el café había más o menos 30 días [sic] que era el tamaño de la finca, para ayudarle a su papá según él le había indicado a ella, llevaba únicamente un canasto y que ella lo vió ir. Mientras caminaba le daba vueltas al canasto. Continuó declarando la señora y dijo que ese es un camino tortuoso, enmalezado, que apenas pasa gente.

Que ella se fue a pie. A pie también iba su hijo Nin adelante y que ya llegando a una de las últimas curvas del camino, al ella tomar la curva se encontró el acusado que blandiendo un machete lo dejaba caer una y otra vez sobre Nin. Dijo ella que no lo mató, lo picó. Que vió como el acusado le daba los machetazos a su hijo y que entonces salió a buscar a Don Agapito a quien encontró que venía y le dijo: 'Félix está matando a nuestro hijo.' Que al regresar hacia el sitio de los hechos, a donde dice que no pudo llegar porqué no le dió el valor para llegar, vió que el acusado se retiraba con un machete en la mano y que estaba manchado de sangre. Dijo además que el camino ese, que el sitio donde habían ocurrido los hechos era una carretera pública. (T.E., primera pieza, págs. 3–4.)''

El otro testigo don Agapito Coriano declaró que cuando llegó al lugar de los hechos el acusado se estaba retirando con un hacha y un machete en sus manos.

De acuerdo con el protocolo de autopsia la víctima recibió diez heridas en la cabeza, seis en la extremidad superior, cuatro en el tórax, siete en la espalda; tres en la extremidad inferior y tres consistentes de varias fracturas, a saber: fractura compuesta de los huesos parietal, temporal y del hueso occipital derecho.

"La cabeza—dice el protocolo—es deforme y presenta las heridas descritas anteriormente. El pabellón auricular derecho está ausente (ablación traumática) Los conductos auditivos externos, las fosas nasales y la cavidad oral están llenas de secreción sanguinolienta. La cara es deforme por las heridas mutilantes. Los globos oculares son normales y las pupilas y escleróticas son blandas. El labio superior está constituído por dos colgajos. La boca presenta fractura del maxilar inferior y destrucción de múltiples piezas dentarias por acción traumática. El cuello, tórax, abdomen, extremidades y la espalda, presentan las lesiones descritas." (T.A. 37)

La teoría del acusado fue la de defensa propia que trató de establecer con su propio testimonio. Después de haber declarado en el examen directo que el día de los hechos estaba trabajando en su finca cuando se presentó la víctima en un

caballo propiedad del testigo, por cual tuvieron una breve discusión y que luego de pedirle la víctima un peso para comprar ron se desmontó del caballo y lo atacó hiriéndolo, por lo que se vio obligado a defenderse con el machete, contestó a preguntas del Fiscal:

"P. ¿Entonces le tira 33 machetazos mientras él lo ataca con esa cosa que no sabe describir?

R. Seguro. El me tiraba. Yo tengo el machete.

P. ¿La cosa de él era una cuchilla chiquita?

R. Una puya así.

P. ¿Cómo era la puya esa?

R. Como de 12 pulgadas.

P. ¿De qué era la lima esa?

R. Una lima.

P. ¿Tuvo que tirarle treintaitres machetazos para poder defenderse de esa lima que es un arma de menos ventaja que la que Ud. tenía?

R. El hombre me ajoraba.

P. ¿Tuvo que tirarle 33 machetazos?

R. Para quitármelo de encima.

P. ¿Déjame ver la herida que le enseñó al compañero?

Hon. Juez: Que se la enseñe al jurado. Después deje verla. ¿esto que está aquí?

R. Sí señor.

Hon. Juez: El Tribunal puede apreciar una cicatriz apagada ya como de dos pulgadas de largo.

P. ¿Ud. quiere decir a los jurados que con esa cosa que ahora dice que es una lima le dió esa herida?

R. Sí señor.

P. ¿No fué asi?

R. El me tira de abajo para arriba.

P. ¿Una sola vez?

R. Me tiró como 50 viajes.

P. ¿En una sola vez lo cogió?

R. Yo me defendí.

P. ¿Qué hizo Nin cuando recibió el quinto machetazo?

R. La tenía en las manos.

P. ¿A pasar del quinto machetazo todavía Nin tenía la lima en las manos?

R. Es un hombre fuerte.

P. ¿Cuándo recibe el machetazo número 25 tiene la lima en las manos?

R. La tiene.

P. ¿Cuando recibe el machetazo número 32 todavía tiene la lima en las manos?

R. La tiene.

Hon. Fiscal: Nada más."

(T.E., primera pieza, págs. 34-35.)

■ Las instrucciones no fueron objetadas por el acusado y cuando el Juez le preguntó a las partes si tenían alguna instrucción adicional que solicitar, el abogado defensor se expresó así: "No señor, vuestro honor cubrió la materia que íbamos a indicar." [1]

Ello no obstante opinamos que las instrucciones no fueron incorrectas, a excepción de una, que por las circunstancias concurrentes no constituyó un error que afectara los derechos sustanciales del apelante, y por ende, que amerite la revocación de la sentencia apelada.

■ El apelante toma fragmentos aislados de las instrucciones al Jurado para impugnar su corrección. [2] Por ejemplo, el apelante ataca una instrucción en al que el juez informa al jurado que la acusación no es prueba y que su responsabilidad debe determinarse analizando la prueba de objetos, documentos y testifical que fue presentada por el Fiscal. Su argumento es que no se hizo referencia a la obligación del Estado de probar el pliego acusatorio más allá de duda razonable. Otro fragmento objetado es aquél en que el Juez instruye que es deber del Jurado determinar cuidadosamente, según los testimonios de los testigos, si las circunstancias inculpatorias de las cuales pueda inferirse la culpabilidad del acusado resultan probadas fuera de duda razonable. Sostiene

[1] Véase *Pueblo* v. *Pinto Medina*, 90 D.P.R. 585 (1964).

[2] En cuanto a esta práctica véanse *Pueblo* v. *Barreto Pérez*, 85 D.P.R. 752 (1962); *Pueblo* v. *Cruz Pabón*, 87 D.P.R. 751 (1963); *Pueblo* v. *Barriera González*, 89 D.P.R. 772 (1964) y *Pueblo* v. *Pinto Medina*, supra.

el apelante que la culpabilidad tiene que ser probada y no inferida.

Después de ese párrafo introductorio el Juez continuó instruyendo así:

"Ninguna regla general podría establecerse para determinar lo que constituye la prueba en un caso en particular. Cada caso es una regla en sí y debe determinarse según sus peculiares circunstancias; pero todas las circunstancias una vez probadas deben ser compatibles entre sí y tomadas en conjunto deben indicar segura y ciertamente la culpabilidad del acusado. El problema es si la evidencia, bien sea circunstancial o testifical o documental establece la culpabilidad del acusado, fuera de duda razonable. *Cuando existe duda razonable en cuanto a esa culpabilidad es obligación del jurado darle el beneficio de la duda al acusado y absolverlo libremente.* Les digo que duda razonable no es meramente una duda posible. Existe duda razonable cuando después de un cuidadoso examen, análisis y comparación de la prueba queda el ánimo de los señores del jurado en tal situación que no pueden decir si tienen una firme convicción respecto a la verdad de los hechos envueltos en la acusación. Esto no significa que debe destruirse toda duda posible ni que la culpabilidad del acusado deba probarse con certeza matemática sino que la evidencia debe producir aquella certeza moral que convence la razón y satisface la inteligencia. No debe ser una duda especulativa e imaginaria. La duda que justifica la absolución de un acusado no sólo debe ser razonable sino que debe surgir de una serena, justa e imparcial consideración de toda la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." (T.E., segunda pieza, págs. 10–11; subrayado nuestro.)

Es obvio que los dos fragmentos objetados no son erróneos. Tampoco es incompleta la anterior instrucción porque no se instruyera al Jurado que la duda razonable produce una rebaja en la calificación del delito ya que en otra parte de las instrucciones este aspecto fue discutido con claridad por el tribunal según correctamente sostiene el Procurador General. El señalamiento de este error es frívolo. *Pueblo* v. *Martínez Díaz*, 90 D.P.R. 467 (1964).

■ Otro fragmento objetado es el siguiente:

"Es deber de ustedes, más bien obligación de ustedes, presumir inocente al acusado hasta que el Estado no le pruebe su culpabilidad . . ."

Aunque pueda haber un error en el uso de la conjunción "no", el texto completo de la instrucción llevó al jurado un concepto claro y correcto de la ley en cuanto a la presunción de inocencia. Dice dicho texto:

"En los casos criminales, señores del jurado, la ley presume que el acusado es inocente hasta tanto no se le prueba lo contrario de modo satisfactorio y con evidencia competente. Es deber de Uds., más bien es obligación de Uds. presumir inocente al acusado hasta que el estado no le pruebe su culpabilidad con evidencia competente y de modo satisfactorio para todos y cada uno de Uds. Es regla de ley que la culpabilidad del acusado debe ser completamente probada. La presunción de inocencia de que les he hablado acompaña al acusado durante el juicio y deben tenerla Uds. presente en el momento de las deliberaciones." (T.E., primera pieza, págs. 11–12.)

■ El Tribunal instruyó al jurado que "en un proceso por asesinato El Pueblo no viene obligado a ofrecer prueba de malicia".

En efecto, la instrucción es errónea. Sin embargo, podemos repetir aquí, por que se aplica a los hechos del presente caso, lo que dijimos en *Pueblo* v. *Crespo Guerrero*, 90 D.P.R. 217 (1964):

"No obstante ser errónea la instrucción aludida, no estaríamos inclinados a revocar por ese solo motivo por entender que en las circunstancias de este caso no se produjo un daño irreparable. En primer lugar, ya antes la Sala sentenciadora había definido correctamente el delito de asesinato en sus dos grados, y había hablado también correctamente en cuanto al elemento de malicia. Aunque la Sala expresara que el Estado no venía obligado a probar la malicia, como cuestión de realidad El Pueblo trajo prueba sobre ese elemento.

Según reza el Art. 200 del Código Penal, la malicia puede ser expresa o tácita; expresa, cuando se manifiesta el propósito

deliberado de quitar la vida ilegalmente a un semejante; y tácita, cuando no resulta notable provocación, a las circunstancias que concurren a la muerte demuestran un corazón pervertido y maligno."

La malicia en este caso es tácita porque las circunstancias que concurren a la muerte demuestran un corazón pervertido y maligno. La prueba rebasa la demostración de estas circunstancias.

■ El apelante objeta también la instrucción sobre homicidio involuntario. Si algún error se cometió en cuanto a esta instrucción fue el de trasmitirla al jurado. Los hechos no la justifican y en todo caso lo que hizo fue favorecer al acusado. Cf. *Pueblo* v. *José Martínez Colón*, Sentencia de 25 de septiembre de 1964.

■ Otra instrucción objetada, es aquella en que el juez le dice al jurado que cuando se alega la defensa propia no puede haberse tenido participación alguna en la contienda donde se causa la muerte y en segundo lugar es necesario que la persona acusada haya estado en inminente peligro de muerte o de sufrir grave daño corporal.

Entiende el apelante que tal instrucción llevó a la mente del jurado la idea de que el acusado estaba obligado a huir hasta llegar a la pared.

La realidad es que el juez instruyó en sentido contrario al jurado. Veamos su instrucción:

" . . . . Quiero que entiendan que la persona atacada no tiene que huir. La ley no exige a ninguna persona a huir. La ley no exige eso. La ley no exige que Ud. se retire y evite la agresión. Ud. puede permanecer donde está y tiene derecho a defenderse; pero tiene derecho a defenderse, a atacar en su defensa, con aquellos medios que sean necesarios a los medios con que está siendo atacado." (T.E., segunda pieza, pág. 22.)

■ El tribunal a quo instruyó correctamente al jurado en el sentido de que si tuviera duda razonable de si el acusado actuó o no en defensa propia debían darle el beneficio de

esa duda y resolver que actuó en defensa propia. *Pueblo* v. *León*, 53 D.P.R. 429 (1938).

■ Finalmente diremos que es frívola la objeción a aquella parte de las instrucciones en que el Juez dice si el jurado cree que si está ausente el elemento de deliberación pero que el acusado quitó la vida al occiso con la intención premeditada deben traer un veredicto de asesinato en segundo grado. El juez no invadió el campo reservado al jurado.

Esta instrucción es incompleta si se lee aisladamente; pero si se continúa leyendo las instrucciones sobre la misión del jurado y los posibles veredictos que éste podía rendir, se verá claramente porque hemos dicho que la objeción es frívola.

El tribunal instruyó al jurado que si creían fuera de duda que el acusado había cometido un delito pero tenían duda en cuanto a cual delito cometió, debía declararlo culpable del delito menor. También les instruyó en el sentido de que si tenían duda razonable de que el acusado cometió un delito de asesinato en primer grado, asesinato en segundo grado u homicidio voluntario, o si tuvieren duda en cuanto a si el acusado es o no culpable del delito imputádole por el fiscal, vienen obligados a absolverlo. Les instruyó además, en el sentido de que si creían que el acusado no cometió ningún delito, o que actuó en legítima defensa, o si tenían duda en cuanto a si el acusado actuó no en defensa propia, era su deber absolverlo.

No se trasmitió pues, al jurado ninguna instrucción errónea que afectara los derechos sustanciales del acusado.

*Se confirmará la sentencia apelada.*